IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTIAN LEE CHITWOOD, | ) | Case No. 4:23-cv-1579 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Christian Lee Chitwood, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. ECF Doc. 1. This matter is before the court pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 7. Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards by failing to adequately articulate why he discounted the state agency psychological consultant, the Commissioner's final decision denying Chitwood's applications for DIB and SSI must be vacated and Chitwood's case must be remanded for further consideration.

## I.    Procedural History

### A.    Initial ALJ Decision

On October 16, 2019, Chitwood filed an application for DIB and SSI. (Tr. 170, 380-386). Chitwood alleged a disability onset date of May 31, 2016, (Tr. 170, 380-381), and

asserted that he was disabled due to ADHD, a cognitive disorder related to hydrocephalus, behavioral problems, anxiety disorder, oppositional defiant disorder, and seizures, (Tr. 175, 425). His applications were denied at the initial level, (Tr. 109-144), and then upon reconsideration, (Tr. 116-133).  On April 20, 2021, a hearing was held before ALJ Paula Goodrich (Tr. 75-108), who issued an unfavorable decision on June 7, 2021.  (Tr. 170-180).  Chitwood requested review of the decision by the Appeals Council.  (Tr. 219-221).

On June 10, 2022, the Appeals Council granted Chitwood's request for review and issued an order vacating the ALJ's decision and remanding the case for further proceedings.  (Tr. 192-194).  The Appeals Council found that that ALJ's decision did not adequately evaluate the opinion evidence of the state agency psychological examiners – in that it did not address "the need for relative isolation and supervisor support when learning tasks identified by state agency psychological examiners or explain why such limitations were not warranted."  (Tr. 192-193).  In relevant part, the remand order instructed the ALJ to:

> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p).  In so doing, evaluate the medical source opinion(s) and prior administrative medical findings pursuant to the provisions of 20 CFR 404.1520c and 416.920c.

(Tr. 193).

### B.    After Remand – Second ALJ Decision

After remand, ALJ Jason Panek heard the matter on December 14, 2022 (Tr. 43-74) and denied Chitwood's claims in a February 1, 2023 decision.  (Tr. 17-32).  The Appeals Council denied further review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).  On June 8, 2023, Chitwood sought judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal and Vocational Evidence

Chitwood was born on June 19, 1998 and was 17 years and 1 month old on the alleged onset date.  (Tr. 30, 147, 157, 380).  Chitwood's prior work experience included working part-time as a dishwasher, machine operator, truck driving assistant, and food delivery driver. (Tr. 20, 426, 875-876).

### B.    Educational Records and Evidence

Chitwood completed his high school education and had a history of special education. (Tr. 155, 160, 165, 426, 456).  While in middle and high school, an Individualized Education Program was created for Chitwood.  *See generally* (Tr. 474-786).  IQ testing demonstrated that Chitwood's full scale IQ was 77, with an overall performance that placed him in the borderline to low average range.  (Tr. 594).  An evaluation team report ("ETR") completed in September 2015 determined that Chitwood exhibited strengths in the areas of reading decoding, reading comprehension, listening comprehension, and spelling skills but he exhibited below average written expression skills, as well as below average math calculation and math problem solving. (Tr. 510).  The ETR also provided that:

> His overall cognitive abilities fall in the "borderline" range.  Although his verbal comprehension and working memory scores fall in the below average to average range, these are relative areas of cognitive strength for [Chitwood].  His cognitive weaknesses are with perceptual reasoning and processing speed tasks.  His cognitive profile suggest that [Chitwood] will require material to be presented at a slower pace with more opportunities for practice.  His extremely low Processing Speed score suggests that he will require additional time on tasks, especially when writing or copying notes is involved.

(Tr. 510).

Chitwood's educational records demonstrated issues with aggressive behavior and deficiencies with his social and adaptive behavior skills.  (Tr. 498, 512, 592, 806-807).  A September 2017 performance summary indicated that Chitwood's behavior and interactions with

his peers interfered with his vocational training and employment opportunities and noted that he: (i) would become easily upset by his interactions with others and refuse to complete work tasks; (ii) was easily distracted by his cell phone; and (iii) had been unable to maintain employment that he had procured in May 2018.  (Tr. 498).

### C.    Medical Evidence

Chitwood was diagnosed at an early age with congenital hydrocephalus that required him have a ventriculoperitoneal shunt implanted ("VP shunt") at 19 months of age.  (Tr. 1680-1682). Chitwood's condition caused headaches and seizures at various points throughout his childhood and into adulthood.  *See generally* (Tr. 1679-1716).

On February 8, 2018, Chitwood was admitted to the emergency department at Hillcrest Hospital with a head injury.  (Tr. 1231-1234).  Chitwood stated he had banged his head on a steel beam at school out of frustration after learning that he lost out on a job opportunity.  (Tr. 1231-1232).  He complained that he had been suffering from headaches for close to a year and stated he had not seen his neurologist since 2011.  (Tr. 1231-1232).  Chitwood's review of systems was unremarkable except for being positive for agitation and self-injury.  (Tr. 1233).  His physical examination was unremarkable; and his psychiatric examination revealed anxious mood and impulsivity but otherwise demonstrated normal behavior, cognition, and memory, as well as a lack of homicidal and suicidal ideation/plans.  (Tr. 1233).  Chitwood was discharged after a CT scan revealed normal results; his head injury was closed, and he was counseled to follow-up with a neurologist.  (Tr. 1234).

On June 9, 2018, Chitwood was seen at the emergency department, complaining of dizziness and headaches which had worsened after going on two rides at a church festival. (Tr. 1227).  Besides being positive for dizziness and headaches, Chitwood's review of systems

and examinations were unremarkable.  (Tr. 1228).  CT scans revealed no shunt abnormalities and Chitwood was instructed to follow-up with a neurologist.  (Tr. 1228-1230).

On July 14, 2018, Chitwood was seen at the emergency department, complaining of a headache and having suffered a three-minute seizure while sitting on a bench outside his grandmother's house.  (Tr. 1208, 1709).  Chitwood's physical and neurological examinations were generally unremarkable; he presented as alert and oriented with sensation intact, (Tr. 1208), and displayed normal appearance, gait, sensory experience, coordination, and mental state. (Tr. 1710-1711).  CT scans revealed no abnormalities.  (Tr. 1209).  Mohit Patel, M.D., a neurologist, reviewed the tests results and determined there was minimal concern for a shunt malfunction and recommended the medication Keppra, a neurological consult, and EEG placement.  (Tr. 1209, 1212-1213).  Chitwood was prescribed Keppra and warned not to engage in activities like driving, climbing ladders, and swimming for at least six months or until his next follow up.  (Tr. 1711).

On July 17, 2018, Chitwood was again seen at the emergency department with complaints of lightheadedness and dizziness.  (Tr. 1224-1225).  Chitwood's review of systems was unremarkable, save being positive for dizziness and syncope, and his physical examination was likewise unremarkable.  (Tr. 1226).  He was discharged with instructions to follow up with his primary care physician.  (Tr. 1227).

On July 23, 2018, Chitwood was brought to the emergency department by law enforcement after expressing suicidal ideation to a friend.  (Tr. 1298, 1302-1303).  Chitwood reported that he had recently begun taking Keppra, expressed frustration with his inability to drive due to the onset of seizures, stated that his uncle had died earlier that week, and refused to answer when asked if he had any suicidal ideation.  (Tr. 1298-1299).  Chitwood was diagnosed

with an adjustment disorder and discharged with instructions to seek counselling or psychiatric care.  (Tr. 1299).

On September 30, 2019, Chitwood saw Stephen Haryadi, M.D., for a preventive health examination and to establish care.  Chitwood wanted to discuss the possibility of skydiving, and his mother sought referrals for an ophthalmologist and a dentist.  (Tr. 1251).  Chitwood reported that he had been asymptomatic, and his review of systems and physical examination were unremarkable.  (Tr. 1251-1254).  Dr. Haryadi deferred clearance for skydiving to a neurosurgeon.  (Tr. 1251).

On October 2, 2019, Chitwood came to the emergency department after suffering a seizure that also caused him to fall and injure his right shoulder.  (Tr. 1336).  His physical examination was largely unremarkable, with pain in his right shoulder but otherwise normal neurological sensation and appropriate mood and effect.  (Tr. 1337-1338).  A CT scan was negative (revealing no abnormalities), X-rays were negative, and lab work demonstrated no concerning findings.  (Tr. 1323, 1338).  Chitwood stated that he had not had a seizure in over a year, and he had discontinued taking daily medication for his seizures.  (Tr. 1336, 1338).

On November 18, 2019, Chitwood saw neurologist Jonathan Zande, M.D., concerning his seizures.  (Tr. 2035).  Dr. Zande determined that Chitwood's VP shunt was functioning properly and conducted a physical examination which demonstrated normal mental status, motor functioning, sensory, and coordination.  (Tr. 2037-2038).  Dr. Zande restarted Chitwood on Keppra and ordered an EEG.  (Tr. 2039-2040).  The EEG results were normal.  (Tr. 2027).

On May 1, 2020, Chitwood followed-up with Dr. Zande, who noted that the EEG results had been normal and Chitwood's most recent seizure episode had been in October 2019. (Tr. 2023, 2026).  Dr. Zande lifted all seizure precautions and restrictions (e.g., driving) and

encouraged Chitwood to continue taking his medication and visit the emergency department if any symptoms developed.  (Tr. 2026).

On October 15, 2020, Chitwood visited Dr. Haryadi for right shoulder pain and regarding disability paperwork concerning his congenital hydrocephalus.  (Tr. 2013).  Dr. Haryadi discussed with Chitwood that he did not qualify for *physical* disability based on his examination results, but also stated there might be some neurological development delay that might warrant disability.  (Tr. 2013).  On October 21, 2020, Chitwood had a telephonic appointment with Dr. Haryadi concerning his right shoulder pain/instability.  (Tr. 2010-2012).  X-rays were negative[1] and Dr. Haryadi ordered an MRI and discussed a conservative course of treatment with physical therapy.  (Tr. 2010-2011).  On November 5, 2020, Richard Barger, M.D., reviewed the MRI results of Chitwood's right shoulder and determined there were no issues with the muscles, tendons, or soft tissues, but there was a "[p]ossible mild nondisplaced tearing of the glenoid labrum between the 11:00 and 12:00 position."  (Tr. 3316-3317, 3633-3634).

On November 13, 2020, Chitwood began outpatient physical therapy to address his right shoulder instability and to help prevent his shoulder from popping in and out.  (Tr. 3797).  Treatment notes indicated that Chitwood underwent physical therapy from November 2020 to February 17, 2021.  *See* (Tr. 3736-3797).  A discharge report after completion of physical therapy stated that Chitwood's: (i) physical therapy had progressed well with strength and pain control; (ii) shoulder stability had improved greatly; and (iii) shoulder had stopped popping (no dislocation) and he was no longer in pain.  (Tr. 3736).

---

[1] Dr. Haryadi reviewed the right shoulder X-rays and found that the osseous structures and soft tissues appeared normal and there was no fracture or dislocation.  (Tr. 3315).

On January 19, 2021, Chitwood saw Dr. Zande, who directed Chitwood to continue taking Keppra and noted that there were no seizure-related restrictions, because Chitwood had been seizure-free for at least 6 months and his epilepsy was stable. (Tr. 3821-3822, 4032-4033).

On March 3, 2021, Chitwood saw Gregory Bee, PA-C, concerning his right shoulder; Chitwood reported a general improvement in his overall symptoms, no further episodes of shoulder instability, and no significant pain or discomfort. (Tr. 4029). Chitwood was encouraged to continue his home PT exercise program. (Tr. 4029). His review of systems was unremarkable and his physical examination demonstrated: "Right shoulder with full and symmetric forward flexion and abduction when compared to the left. He has external rotation to 70 degrees bilaterally. Negative apprehension on the right. Negative O'Brien's." (Tr. 4029-4031).

On January 5, 2022, Chitwood had a follow-up for his epilepsy with Karlee Hanchin, APRN-CNP. (Tr. 3832-3834, 4025-4028). Chitwood reported that: (i) he had been compliant taking his medication, did not miss doses, and noticed no side effects; (ii) he had not suffered a seizure since October 2019 (with only four episodes since 2004); and (iii) his mood was stable and sleep was adequate. (Tr. 3822). His physical examination was unremarkable, with normal mental status, orientation, memory, attention, motor function, and coordination. (Tr. 3834).

On October 14, 2022, Chitwood presented at an urgent care center for a cough that had kept him up the preceding night and which he reported had been present "for years," along with postnasal drip that allergy medicine had not helped. (Tr. 3941-3942). Chitwood's physical examination was unremarkable, he was found to have a normal affect, no focal deficits, and 5/5 strength in all extremities. (Tr. 3942). He was prescribed allergy and cough medication and advised to follow-up with a doctor if there was no improvement. (Tr. 3942).

On December 1, 2022, Chitwood saw Dr. Haryadi for a right foot lesion, initially caused by a splinter, and a neck injury suffered after being tackled while playing flag football in the snow on Thanksgiving.  (Tr. 4016-4017).  Chitwood denied any headache, head trauma or loss of consciousness and stated that a heating pad relieved his pain after 15 to 20 minutes.  (Tr. 4017).  His review of systems and physical examination were unremarkable, expect for mild tenderness on his right shoulder.  (Tr. 4018-4020).

### D.  Nonmedical Opinion Evidence

In July 2020, Chitwood was referred to a community rehabilitation program for vocational rehabilitation by the Opportunity for Ohioans with Disabilities.  (Tr. 470-472).  The referral indicated that Chitwood suffered limitations in: (i) interpersonal skills, with issues in engaging in appropriate interactions and responding appropriately to the behavior and communication of others; (ii) personal hygiene; (iii) completing tasks without supervision; and (iv) cognitive processing, with an inability to perform at the level of speed and quality expected of others and requiring repeated demonstrations to learn work tasks.  (Tr. 471).

In an April 15, 2021 letter, Chitwood's mother, Angela Day, stated that he had been diagnosed with hydrocephalus at 18 months of age and this condition had caused many hardships in his childhood, including struggles with behavioral issues, learning, and self-confidence.  (Tr. 860).  She further stated that Chitwood: (i) currently needed daily reminders to engage in self-care and complete chores; (ii) did not adapt well to change; (iii) could not multi-task at school or work; and (iv) would get overwhelmed when multi-tasking and would shut down, resulting in anger, putting his head down, or walking away.  (Tr. 860).  Finally, she stated that Chitwood needed one-on-one help while learning a new task and needed constant reassurance.  (Tr. 860).

9

In a November 2022 email to Chitwood's lawyer during the administrative proceedings, Richard Cesta, a service and support administrator with the Trumbull County Board of Developmental Disabilities ("TCBDD"), stated that Chitwood had an individualized service plan and noted: "Like many people we serve, they can work in community, but still need guidance. . .. Christian can work but does have some problems with focusing on a job. . . . I recently assisted Christian in receiving food assistance, he needed help with food purchasing."  (Tr. 937).  In a follow up email, Mr. Cesta stated that Chitwood had been placed in a part-time position at the Air Base but he'd had several issues working alone and completing work assignments without working alongside others, and he stated that Chitwood now only worked big event weekends when there are lots of co-workers to help.  (Tr. 939).  Mr. Cesta also stated, "I hope this will help Christian.  I have seen many people we serve who are higher functioning like Christian and even drive a car and work in community, they were able to receive [social security benefits].  I have no idea why they are giving him such a difficult time."  (Tr. 939).

### E.  Medical Opinion Evidence

#### 1.  Dr. Konieczny - Consultative Psychological Evaluation

On December 23, 2019, Chitwood underwent a consultative psychological evaluation with Joseph Konieczny, Ph.D.  (Tr. 1360-1366).  Dr. Konieczny administered intelligence testing and concluded that Chitwood had some mild intellectual deficits, with a full-scale IQ of 76 and intellectual capabilities in the borderline range.  (Tr. 1362-1363).  After interviewing Chitwood and reviewing available background and testing information, Dr. Konieczny opined that:

> Chitwood suffers from a diagnosis of Mild Neurocognitive Disorder, due to history of hydrocephalus and recent seizure episodes.  Again, Christian would appear to suffer from some mild intellectual decline, particularly in some of the nonverbal areas that is likely a residual effect of his history of hydrocephalus, brain surgeries, and his recent seizure episodes.  No further diagnosis is offered.

10

(Tr. 1363).  Dr. Konieczny found that Chitwood suffered no obvious limitations in the areas of "ability to understand, remember, and carry out instructions" and "attention and concentration and persistence in single and multi-step tasks."  (Tr. 1363).  However, he found that Chitwood, due to his neurocognitive deficits, had limitations and difficulties in his ability to respond to severe supervision, interpersonal situations in the work setting, and severe pressure situations in the work setting.  (Tr. 1363).

## 2.    Dr. Zande - Medical Source Statement

In April 2021, Dr. Zande completed a "Medical Source Statement" and checked boxes indicating that Chitwood: (i) could stand, walk, and sit for more than 6 hours each in an 8-hour workday; (ii) did not require extra rest outside of normal work breaks; (iii) could frequently lift up to 25 pounds and occasionally lift up to 50 pounds; and (iv) should not drive or operate heavy machinery, climb heights, or work with an open flame if he suffered a breakthrough seizure. (Tr. 3803-3804).

## 3.    State Agency Medical Consultants

On initial review, state agency reviewing medical consultant Rohini Mendonca, M.D., completed an assessment of Chitwood's physical residual functional capacity ("PRFC"). (Tr. 119-120, 136-137).  Dr. Mendonca opined that Chitwood could perform work at all exertional levels but he: (i) could never climb ladders, ropes, or scaffolds; and (ii) should avoid all exposure to hazards, including no working at unprotected heights, no working with hazardous machinery, and no operation of a commercial motor vehicle.  (Tr. 119-120, 136-137).  At the reconsideration level, Lynne Torello, M.D., reviewed and affirmed Dr. Mendonca's findings as to Chitwood's PRFC.  (Tr. 152-153, 162-163).

11

### 4.      State Agency Psychological Consultants

On initial review, state agency reviewing psychological consultant David Biscardi, Ph.D., completed a Psychiatric Review Technique ("PRT"), (Tr. 116-117, 133-135), and an assessment of Chitwood's Mental Residual Functional Capacity ("MRFC"), (Tr. 121-123, 138-140).   Dr. Biscardi opined that Chitwood had certain moderate limitations in his ability to: (i) understand and remember detailed instructions; (ii) carry out detailed instructions; (iii) maintain regular attendance and punctuality; (iv) perform at a consistent pace; (v) accept instructions and response appropriately to criticism from supervisors; and (vi) respond appropriately to changes in the work setting.  (Tr. 121-122, 138-149).  For the MRFC, Dr. Biscardi found that:

> [Chitwood] retains the capacity to understand, remember, carry out and sustain performance of 1-3 step tasks (but would become overwhelmed if the procedures were more complicated), complete a normal workday, interact with coworkers/supervisors and adapt to changes/stressors associated with simple routine competitive work activities.

(Tr. 123, 140).

At the reconsideration level, Cindy Matyi, Ph.D., provided an analysis that somewhat differed from Dr. Biscardi's, with Dr. Matyi opining the following limitations:

> [Chitwood] is able to comprehend and remember simple (1-2 step) and occasional complex/detailed (3-5 step) instructions.
>
> [Chitwood] can carry out simple (1-2 step) and occasional complex/detailed (3-5 step) tasks, maintain attention, make simple decisions, and adequately adhere to a schedule. Would need a relatively isolated workstation and supervisory support when first learning job tasks.
>
> [Chitwood] is susceptible to misinterpreting interpersonal nuance, yet can relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny.
>
> [Symptoms] would exacerbate in the face of perceived stressors, yet the claimant can adapt to a setting in which duties are routine and predictable and in which

changes are infrequent, explained in advance, and introduced slowly.  Would require supervisory support with goal-setting and planning.

(Tr. 153-155, 163-165).

### 5.     Ohio Department of Developmental Disabilities Forms

On May 1, 2018, Cindy Brown, an evaluator for the Geauga County Board of Developmental Disability, completed an Ohio Disability Determination Instrument ("OEDI") answer sheet for Chitwood.  (Tr. 1643-1667).  The first page of the OEDI form listed the following persons as informants for the application: (i) Chitwood; (ii) Laurie McDonald, "CEVEC"; and (iii) Psychologist Frank Pitrelli, "consult to evaluation."  (Tr. 1643).  The form indicated that Chitwood had substantial functional limitations ("SFL") in the areas of self-care, self-direction, and economic self-sufficiency, but he had no SFLs in the areas of mobility, capacity for independent living, learning, and receptive/expressive language.  (Tr. 1667).  For self-care, Brown marked that Chitwood had issues washing himself and brushing his teeth. (Tr. 1648-1649).  For self-direction, Brown noted that Chitwood had acted in a way that caused harm to himself, citing the incident when he banged his head in anger against the wall at his work site.  (Tr. 1652).  For economic self-sufficiency, Brown marked that Chitwood had issues with promptness and regular attendance at work, commenting that he was consistently late or missing work.  (Tr. 1663-1664).

On May 17, 2018, the superintendent of the Geauga County Board of Developmental Disability completed a Form for Eligibility Determination ("FED") which had checkmarks indicating that Chitwood had three areas of SFLs, citing Chitwood's OEDI form, and that Chitwood was thereby eligible for disability services from the county.  (Tr. 1668).

F.      **Testimonial Evidence**

1.      **Relevant Portions of the Original Hearing – April 2021**

At the initial ALJ hearing, Chitwood testified that he had been working with TCBDD for two years to help secure part-time employment and to apply for disability.  (Tr. 86-87).  He testified he was only seeking part-time employment because TCBDD did not think he could handle full-time employment.  (Tr. 87-88).  He testified that in past jobs he had issues with forgetting instructions, needing reminders, not working fast enough, and needing daily assistance.  (Tr. 88-90).

Chitwood testified that he had hydrocephalus which caused him to struggle in school and created difficulties in understanding things.  (Tr. 91).  He discussed his epilepsy and how Keppra caused sleepiness as a side effect.  (Tr. 91-93).  He also testified that he had right shoulder instability, with a minor tear in his labrum, which had been helped by physical therapy.  (Tr. 93).  However, he stated that the physical therapy did not fully correct the issue and he still did not trust lifting anything "super heavy."  (Tr. 93-94).  He testified that he could not lift or pull more than ten pounds without his right shoulder popping out of place.  (Tr. 94).

Chitwood testified that he lived with numerous people from his family, and he helped take the dogs out, take some trash out, and clean his own room.  (Tr. 95).  He testified that his typical day consisted of taking his medication, playing video games, taking the dogs for a walk, and watching videos online.  (Tr. 95-96).  He testified that he felt he was unable to work a full-time job because of fatigue caused by his medication, as well as problems with focus and concentration caused by his medical condition.  (Tr. 96).  In response to questioning by the ALJ, Chitwood testified that he still required reminders on how to do work even after three to four

weeks on a job.  (Tr. 97-98).  He also stated that he had issues performing job duties because of his right shoulder injury.  (Tr. 98).

In relevant part, the ALJ asked a vocational expert ("VE") whether there would be any jobs for an individual who required a totally isolated workstation.  (Tr. 105).  The VE responded that such a restriction would be work preclusive.  (Tr. 105).

### 1.    Remand Hearing – December 2022

At the remand hearing, the ALJ stated that Chitwood's testimony from the April 2021 hearing remained good evidence and he would use the testimony in that hearing "in support of my decision and however that decision ends up going."  (Tr. 51).  The ALJ stated that the focus of the remand hearing would be to review things that had happened in the year and a half since the initial hearing.  (Tr. 51).

### a.    Claimant Christian Chitwood

Chitwood testified that he was still participating in vocational rehabilitation services and currently worked at the Youngstown Air Force Base four or five days a month since October/November 2021.  (Tr. 52).  He testified that he was working reduced hours because he had been struggling and needed someone with him at all times to help him with focus and provide reminders.  (Tr. 52-53).  When asked what kinds of things he had trouble remembering, he answered: "Because they have me do a lot of extra, like, cleaning activities, I either mess up or forget about them."  (Tr. 53).  He described his job responsibilities at the Air Force base as primarily dishwashing, sweeping and mopping floors, and setting up the dining room and testified that he would sometimes have trouble putting utensils in the wrong place (at least once a month).  (Tr. 53-54).

Chitwood testified that he had been suffering from a persistent cough for the past three to four years and he had recently sought treatment. (Tr. 55). He again testified that he had focus issues which occurred when he was asked to perform more than one simple task and he needed someone to help him on a regular basis with focus and keeping things straight. (Tr. 56-57). He also testified that he still had problems with his right shoulder "popping out" and he could only lift ten pounds before worrying about injuring himself. (Tr. 58-59).

The ALJ asked Chitwood about how he got along with coworkers and supervisors, and Chitwood responded that he gets along with everyone except that the manager gets "a little ticked off" because of the things that he does. (Tr. 60). Chitwood testified that has friends but he did not see them often and the closest one was 45 minutes away. (Tr. 60-61). He further testified that he: (i) had no problems with any of the employees; (ii) nobody had ever suggested that his attitude, language, and interactions were inappropriate; and (iii) he generally felt comfortable around other people while at work. (Tr. 61-62).

### b.    Angela Day – Claimant's Mother

Chitwood's mother, Angela Day, testified at the remand hearing. (Tr. 62-67). She testified that Chitwood told her about difficulties at work, stating, "he has a hard time, like, focusing and putting stuff, like, putting in orders for the freezer, the refrigerator. He can't really focus on what goes where. He needs continuous guidance. That's why they've got him down to one day a week, or one weekend a month." (Tr. 64). She further testified that employees with Trumbull County told her they have had trouble finding jobs for Chitwood because he needed extra guidance and had problems with memory and focus. (Tr. 64-65). Regarding household chores, Day testified that Chitwood: (i) needed constant reminders to clean his room, shower, and perform other daily functions, (Tr. 65); and (ii) had problems focusing, finishing tasks, and

knowing what needed to be done, (Tr. 66-67). Day testified that Chitwood needed help getting ready for work, and that she had to get his clothes for him and to make sure he showered and kept himself properly groomed. (Tr. 66).

### c. Vocational Expert

VE Gail Klier also testified. (Tr. 67-73). The ALJ posed his first hypothetical, asking the VE whether she could identify work in the national economy for a hypothetical young individual with at least a high school education and with no past work who was limited in the following respects: (i) limited to a range of light work involving no climbing of ladders, ropes, or scaffolds; (ii) cannot perform any overhead reaching with the non-dominant right upper extremity, can frequently reach in other directions, and can frequently reach in all directions with the left upper extremity; (iii) must avoid all exposure to hazards such as unprotected heights, dangerous moving machinery, that would include the operation of a motor vehicle; (iv) can understand and remember simple instructions; (v) can occasionally interact with coworkers or the public on a superficial basis, meaning no group or tandem tasks; (vi) no tasks involving confrontation, arbitration, negotiation, conflict resolution or direction of the work of others; (vii) can attend to and carry out routine repetitive tasks but are not subject to high or fixed-paced requirements such as assembly line work; and (viii) can adapt to infrequent changes in the work setting or duties that are explained or demonstrated in advance. (Tr. 68).

The VE testified that this hypothetical individual could perform the following jobs which are performed at a light physical demand and SVP 2 level (unskilled work): (i) marker; (ii) cleaner housekeeping; and (iii) routing clerk.[2] (Tr. 70). She also testified that three listed

---

[2] The VE initially testified that the hypothetical person could perform work as an automatic carwash attendant, but removed that example because she had not factored in a limitation to only occasional interaction with the public. *See* (Tr. 69-70).

positions were examples and there were other positions that the hypothetical person could perform.  (Tr. 69).  The ALJ and the VE had the following exchange about adding another limitation:

> [ALJ] If an individual would require redirection or reinstruction to persist at the kind of jobs that you've described, the marker, housekeeping cleaner, or routing clerk jobs, and required that intervention two times in the course of the workday on a sustained basis, is that something that would be tolerated by -- customarily, or would that be an accommodation?
>
> [VE] No.  That is not customarily tolerated.  That is an accommodation.  So on an ongoing basis, that's going to be a work preclusive situation.
>
> [ALJ] Do you have an opinion as to . . .
>
> * * *
>
>  where the threshold is as to what would be customarily tolerated in these kinds of simple routine work for, you know, a supervisor or intervention?
>
> [VE] Not much.
>
> [ALJ] Right.
>
> [VE] Usually, it's, you know, the instruction is given during a probationary training period, and then if there is a question after that period is over, or if the supervisor is noticing something is being done incorrectly, there may be a redirection or reinstruction once or twice.  But nothing beyond that, and certainly, nothing ongoing.

(Tr. 70-71).

During cross-examination by Chitwood's counsel, the VE testified that there would be no jobs available at a light exertional level if the hypothetical person was limited to only occasionally lifting ten pounds.  (Tr. 72-73).  The VE also testified that a weekly redirection or reinstruction of an employee by a supervisor would constitute an accommodation.  (Tr. 73).

## II.    ALJ's Decision on Remand

At Step Four, the ALJ determined that Chitwood had the residual functional capacity ("RFC") to perform work at the light exertional level, with the following exceptions:

18

> [H]e can never climb ladders, ropes, or scaffolds.  He can never perform overhead reaching with his non-dominant right upper extremity. He can frequently reach in all directions with his right upper extremity.  The claimant can never work around unprotected heights or dangerous moving machinery, and cannot operate a commercial vehicle.  The claimant can understand and remember simple instructions.  He can occasionally interact with co-workers and the public on a superficial basis, meaning no tandem tasks and no work tasks involving confrontation, arbitration, negotiation, conflict resolution, or directing the work of others.  He can attend to and carry out routine, repetitive tasks that are not subject to high or fixed pace requirements (e.g. assembly line work).  The claimant can adapt to infrequent changes in work setting or duties that are explained or demonstrated in advance.

(Tr. 20).

### A.        Analysis of Subjective Symptom Complaints and Medical Evidence

The ALJ first summarized Chitwood's disability reports, the hearing testimony, and the medical evidence on the record.  (Tr. 23-26).  The ALJ then found that the above evidence supported limitations related to Chitwood's seizure disorder and right shoulder problems and the RFC accounted for these physical limitations by limiting work to the light exertional level and adding reaching and environmental restrictions.  (Tr. 26).  The ALJ then addressed Chitwood's neurocognitive and adjustment disorders, noting his low IQ scores, difficulties in obtaining and keeping jobs, and diagnosis of an adjudgment disorder.  (Tr. 26).  The ALJ found some limitations relating to his neurocognitive and adjustment disorders, stating:

> However, he has had extremely limited mental health treatment. He has declined specialized mental health treatment, indicating that his symptoms are not as severe as alleged.  Nonetheless, the undersigned has attempted to accommodate his remaining symptoms by limiting the claimant to simple, routine and repetitive tasks with no fast pace requirements, limited social requirements, and infrequent that are explained or demonstrated in advance as described in the residual functional capacity.

(Tr. 26).

At the end of Step Four, the ALJ stated that the RFC was "supported by the medical evidence, the claimant's testimony, and the rest of the record."  (Tr. 29).  He then stated that:

"The record does not support a finding that the claimant's physical and mental impairments are as severe as alleged, and the medical evidence in this case, along with the claimant's activities of daily living, support the conclusion that the claimant can perform light work, with the restrictions outlined above."  (Tr. 29-30).

### B.  Analysis of Relevant Expert Opinions

#### 1.  State Agency Reviewing Consultants

The ALJ found the opinions of the state agency medical consultants to be partially persuasive, to the extent that the ALJ agreed with the opined postural and environmental limitations ("The suggestions for no climbing of ladders, ropes or scaffolds and avoidance of work related hazards are supported by the diagnosis of seizures.") but determined that an exertional limitation to light work was appropriate ("[L]ight work is more consistent with the risk of breakthrough seizures.").  (Tr. 27).

The ALJ found the opinion of the state agency psychological consultant Dr. Biscardi to be partially persuasive because: (i) the opinion was based on evidence in the record in 2020; and (ii) more recent evidence is more consistent with the greater functional limitations found in the RFC.  (Tr. 28).  The ALJ also found the opinion of state agency psychological consultant Dr. Matyi was only partially persuasive and supportable.  (Tr. 28).  The ALJ summarized Dr. Matyi's opined limitations and found them to be inconsistent with the record evidence.  The ALJ rejected the need for regular supervisory support and a relatively isolated workstation.  (Tr. 28).

#### 2.  Ohio Disability Forms

The ALJ considered the above-described OEDI and FEC application forms and found them to be unpersuasive, stating:

> Although the questionnaire for this application contains many references to the claimant's ability to perform a wide range of activities, it is unclear how much

20

information was based upon self-report.  There is some indication that the answers
were corroborated or given by the claimant's psychologists, Frank Pitrelli and
Laurie McDonald.  ([Tr. 1643].)  In any event, the answers contained in the
application generally indicate that the claimant has difficulty completing his
activities of daily living independently, and struggles with hygiene, personal
relationships, and dealing with stress.  The undersigned does not find this
application persuasive or supportable, as the basis of the answers and restrictions
are unclear.  Moreover, it seems likely that the restrictions given were somewhat
exaggerated in order to qualify the claimant for State disability and occupational
services.  Such limits are not corroborated by any mental health treatment.

(Tr. 29).

### 3.      Richard Cesta's Emails

The ALJ also considered the emails from Mr. Cesta, the service and support

administrator for TCBDD, summarizing their contents and context.  (Tr. 29).  The ALJ found the

emails to be unpersuasive and unsupported, stating, in part:

> Indicating the claimant is "like many people" who receive services is vague and
> fails to explain the claimant's own needs for "guidance."  This source also indicated
> the claimant was "higher functioning" than some of the clients he was being
> compared to.
>
> * * *
>
> [Chitwood] was noted to have "great work ethic and an ability to work towards
> daily goals and quotas" in a high school vocational program. ([Tr. 842]) The
> employer in 2022 indicated he did "pretty well" as long as he was not alone at work,
> which is not indicative of an individual who is precluded from all full-time
> employment. ([Tr. 949]) Further, this is not a medical source, and there is no
> associated mental health treatment to support any proposed limits.  Based on the
> foregoing, these letters are not persuasive or supportable.

(Tr. 29).

## III.   Law & Analysis

### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.  Step Four – Improper Discount of Opinion Evidence

Chitwood contends that the ALJ's RFC is unsupported and lacks the requisite logical bridge because he improperly rejected the opinions of: (i) the state agency psychological consultant Dr. Matyi; (ii) Dr. Pitrelli, Dr. McDonald, and the Ohio Department of Developmental

Disabilities, which were found within the OEDI and FEC application forms; and (iii) Mr. Cesta, a TCBDD service and support administrator.  *See* ECF Doc. 10 at 23-28.  The Commissioner disagrees, arguing that the ALJ's decision is supported by substantial evidence and the ALJ complied with the regulations and provided reasoned explanations for rejecting the above opinions.  ECF Doc. 12 at 6-12.

### 1.  Dr. Matyi's Opinion

Chitwood argues that the ALJ erred in rejecting Dr. Matyi's opinion that Chitwood would require regular intervention by supervisors and a relatively isolated workstation because substantial evidence supported those limitations, and the ALJ did not: (i) cite evidence in the record that undermined those limitations; (ii) sufficiently explain why those limitations were excluded; or (iii) discuss the supportability and consistency of Dr. Matyi's opinion.  ECF Doc. 10 at 24-27.  The Commissioner argues that the ALJ cited specific evidence and provided a reasoned explanation for rejecting the opined limitations and also sufficiently discussed the supportability and consistency of Dr. Matyi's opinion.  ECF Doc. 12 at 7-9.

An ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  An ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, when evaluating the persuasiveness of medical opinions and prior administrative findings, an ALJ must consider the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's

policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c).  At a minimum, the ALJ *must* explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2) (providing that an ALJ "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [the claimant's] case record.").

According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).  "Put simply, consistency is about how the medical opinion conflicts with evidence in the record, whereas supportability is about how the medical opinion was soundly reached."  *David C. v. Comm'r of Soc. Sec.*, No. 22-11292, 2023 U.S. Dist. LEXIS 199890, at *6 n.1 (E.D. Mich. Nov. 7, 2023) (citing SSR 96-2p, 1996 SSR LEXIS 9).  "As long as the ALJ discussed the supportability and consistency of the opinion and supported his conclusions with substantial evidence within his decision, the Court will not disturb his decision."  *Njegovan v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-00002-CEH, 2022 U.S. Dist. LEXIS 87318, at *13 (N.D. Ohio May 13, 2022).

Even though the current regulations are less demanding than the former rules governing the evaluation of medical opinions, an ALJ must still provide a coherent explanation of his reasoning.  *See Cormany v. Kijakazi*, No. 5:21CV933, 2022 U.S. Dist. LEXIS 163437, at *7

(N.D. Ohio Sep. 9, 2022) (quoting *Lester v. Saul*, 2020 U.S. Dist. LEXIS 247187, at *39 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 U.S. Dist. LEXIS 6594 (N.D. Ohio Jan. 13, 2021); *see also Stephen D. v. Comm'r of the SSA*, No. 1:22-cv-378, 2023 U.S. Dist. LEXIS 149786, at *6-7 (S.D. Ohio Aug. 24, 2023).  The regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'"  *Warren I. v. Comm'r of Soc. Sec.*, No. 5:20-CV-495 (ATB), 2021 U.S. Dist. LEXIS 42246, at *22-23 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01, 5858 (January 18, 2017)).  An "ALJ's failure to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence."  *Cormany*, 2022 U.S. Dist. LEXIS 163437, at *7 (quoting *Vaughn v. Comm'r of Soc. Sec.*, 2021 U.S. Dist. LEXIS 134907, at *32 (W.D. Tenn. July 20, 2021); *see also Childers v. Kijakazi*, 2022 U.S. Dist. LEXIS 122706, at *13 (E.D. Ky. July 12, 2022) ("When the Court is unable to follow the ALJ's logic, error has occurred.")

First, the ALJ's rejection of a limitation to a relatively isolated workstation is somewhat problematic.  The ALJ stated the following to explain his rejection of an isolated workstation limitation:

> Relative isolation, as suggested, [] is not a defined term.  Educational records reflect declining behavioral interventions.  The claimant was described as cooperative and pleasant by the consultative examiner.  He was able to engage in team sports in track and field and cross country.  He was also able to play football with a group of people this past Thanksgiving.  This evidence is more consistent with a finding that he could at least occasionally interact with coworkers and the public on a superficial basis.

(Tr. 28).  Although the term "relative isolation" is not a term defined in the Dictionary of

Occupational Titles, that does not provide a sufficient reason to reject an opinion that a claimant would require a relatively isolated workstation, nor has the Commissioner provided any authority to support such a contention.  Moreover, other ALJs and several courts, including those in this circuit, have either used or analyzed the term "relative isolation," without finding the term to be too vague or unspecific to express a work-related functional limitation.[3]  *See e.g.*, *Bratten v. Berryhill*, No. CIV-16-232-F, 2017 U.S. Dist. LEXIS 30392, at *6 (W.D. Okla. Feb. 16, 2017) (collecting cases) ("Research did reveal, however, that the phrase is frequently used in RFC assessments to describe a work-related functional limitation."); *see also Johnnie T. v. Comm'r of Soc. Sec.*, No. 2:22-cv-3721, 2023 U.S. Dist. LEXIS 166053, at *29-30 (S.D. Ohio Sep. 18, 2023); *Kearns v. Comm'r of Soc. Sec.*, No. 3:19 CV 01243, 2020 U.S. Dist. LEXIS 95697, at *37-39 (N.D. Ohio Feb. 3, 2020); *Huff v. Astrue*, No. 2:11CV61 RWS/FRB, 2012 U.S. Dist. LEXIS 133751, at *50-56 (E.D. Mo. Aug. 31, 2012).

The ALJ appears to have addressed the consistency factor with relation to the isolated workstation limitation by: (i) citing evidence that Chitwood engaged in team sports, played football with friends, and was cooperative and pleasant during his consultative examination with Dr. Konieczny; and (ii) stated that this evidence was more consistent with the limitations found in the RFC.  (Tr. 28).  But the ALJ does not appear to have addressed the supportability factor; he did not address Dr. Matyi's reasoning or explanation for opining that Chitwood would require such a limitation.  (Tr. 28).  Nevertheless, the ALJ's RFC did limit Chitwood to occasional interaction with coworkers and the public on a superficial basis.  (Tr. 28).  Such limitations sufficiently accounted for the "relatively isolated workstation" limitation opined by Dr. Matyi.

---

[3] As noted by Chitwood, the ALJ for the initial decision (Paula Goodrich) and the Appeals Council when it remanded for further proceedings did not approach the term as undefinable or too vague for purposes of determining disability.  *See* (Tr. 105, 192-194).

*See Stamper v. Comm'r of Soc. Sec.*, No. 1:18-cv-697, 2019 U.S. Dist. LEXIS 97816, at *14 n.4 (N.D. Ohio May 8, 2019), *report and recommendation adopted*, 2019 U.S. Dist. LEXIS 97816 (N.D. Ohio June 11, 2019) ("In Social Security parlance, 'occasional' means 'occurring from very little up to one-third of the time'") (quoting SSR 83-10, 1983 SSR LEXIS 30, at *13); *see also Davis v. Comm'r of Soc. Sec.*, No. 3:22-cv-1259, 2023 U.S. Dist. LEXIS 108123, at *21-22 (N.D. Ohio Mar. 30, 2023), *report and recommendation adopted*, 2023 U.S. Dist. LEXIS 142830 (N.D. Ohio Aug. 15, 2023) (finding that an ALJ's RFC limitation to "no more than occasional contact with co-workers, supervisors, and the general public" sufficiently accounted for a state agency consultant's opined limitation for a relatively isolated workstation).  Thus, there was no reversible error regarding this opined limitation.

That said, the ALJ did not sufficiently articulate his reasons for rejecting Dr. Matyi's opinion that Chitwood would require increased supervisory support.  Dr. Matyi opined that Chitwood would require "supervisory support when first learning job tasks" and "supervisory support with goal-setting and planning."  (Tr. 164-165).  The ALJ rejected that opinion because:

> Full scale IQ scores and educational supports offered to the claimant suggest an inability to understand and remember complex instructions, while the claimant retains the capacity for simple instructions.  The evidence does not support a finding that the claimant would require regular intervention by a supervisor to attend to such tasks, eliminating the need for such involvement suggested by the consultants.

(Tr. 28).  First, the ALJ appears to have made a consistency finding by stating that "the evidence" does not support "regular intervention by a supervisor" and the level of involvement opined by Dr. Matyi.  But the ALJ did not cite, explain, or describe what record evidence supported his rejection of greater supervisory support.  To the extent that "the evidence" being referenced was the "Full scale IQ score and educational supports offered to the claimant," the ALJ failed to cite or describe the specific educational supports he used to support his conclusion,

nor did he provide any analysis or explanation as to how such evidence contradicted or undermined increased supervisory support. Moreover, Dr. Matyi found a need for increased supervisory support that was unrelated to the ability to perform only simple tasks (need for increased support when first learning the job and need for goal-setting and planning with a supervisor), a finding the ALJ did not address.

As such, the court can only speculate as to what specific evidence or reasoning the ALJ utilized to discount the limitation opined by Dr. Matyi. An ALJ must provide analysis of the consistency and supportability factors sufficient to allow "a subsequent reviewer or a reviewing court to trace the path of [the ALJ's] reasoning." 82 Fed. Reg. 5844, 5858. But the ALJ failed to do so in this instance. Moreover, the court cannot determine whether the ALJ made an improper medical determination. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings" (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also See Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("[A]n ALJ 'does not have the expertise to make medical judgments.'"). Any attempt to speculate is outside the scope of our review; it is not the role of the court to re-weigh evidence, decide questions of credibility, or substitute the court's judgment for that of the ALJ. *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012). Accordingly, the ALJ failed to build the logical bridge necessary for meaningful review. *See Fleischer*, 774 F. Supp. 2d at 877.

The court further finds that such an error was not harmless because the VE testified that a limitation requiring regular intervention and support from a supervisor could be potentially work preclusive and would qualify as an accommodation. (Tr. 70-73). Accordingly, because the ALJ failed to follow the proper legal standards and failed to sufficiently articulate his reasoning for

28

discounting the increased supervisory support limitation, the ALJ's decision must be remanded for further consideration.  *See* 20 C.F.R. §§ 404.1520c(b)(2), (c); *Cormany*, 2022 U.S. Dist. LEXIS 163437, at *7; *cf. Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (providing that an ALJ's failure to comply with the procedural requirements for discounting a medical opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record'" (citing *Rogers*, 486 F.3d at 243)).

### 2.    The Remaining Relevant Medical Opinions

As for the remainder of Chitwood's assignments of error, the court finds no reversible error in the ALJ's decision to discount the applications for services from the Ohio Department of Developmental Disabilities and the letters from Mr. Cesta.

Chitwood contends that the ALJ erred in "rejecting the opinions of Dr. Pitrelli, Dr. McDonald, and the Ohio Department of Developmental Disabilities" because: (i) there was no evidence to support the ALJ's contention that the answer in the applications for services were exaggerated; and (ii) the record supported the limitation noted in the applications.  ECF Doc. 10 at 27.  First, it is far from clear that the OEDI application form for the Ohio Department of Developmental Disabilities can be considered the opinion of Dr. Pitrelli and Dr. McDonald.  The OEDI application was prepared and completed by Cindy Brown, an evaluator for the Geauga County Board of Developmental Disability.  *See* (Tr. 1643-1667).  The OEDI application listed Dr. McDonald and Dr. Pitrelli as "informants" for the application but did not indicate or reflect: (i) what input they provided; (ii) the nature and length of their relationship with Chitwood; (iii) what their own opinions were; or (iv) whether they agreed with the assertions in the OEDI application.  *See* (Tr. 1643-1667).  Second, the ALJ didn't merely dismiss the OEDI and FED application forms because of possible exaggeration, as Chitwood contends.  Rather, the ALJ

29

found the applications unpersuasive and unsupportable because: (i) it was unclear how much of the information in the applications was self-report; (ii) the bases for the answers and the restrictions in the applications were unclear; and (iii) the limitations in the applications were not corroborated by any mental health treatment.  (Tr. 29).

Third, any alleged error in the ALJ's rejection of the application forms was harmless because the OEDI and FED applications were checklist/questionnaire forms, which contained markings indicating whether Chitwood had limitations in certain areas but did not contain citation to any medical evidence or detailed explanation for these specific findings.  *See* (Tr. 1643-1668).  Courts within the Sixth Circuit have consistently determined that checklist opinions which lacked accompanying explanations, are unsupported, patently deficient, and a sufficient reason to discount a medical opinion.  *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016) (finding that checkbox or checklist evidence was "'weak evidence at best' and meets our patently deficient standard") (citations omitted)); *Marks v. Comm'r of Soc. Sec.*, No. 1:16-cv-02848, 2018 U.S. Dist. LEXIS 20220, at *23 & n.5 (N.D. Ohio Jan 12, 2018) ("Numerous decisions have found that the use of checklist or check-the-box forms in which the doctor provides little or no accompanying explanation for the assessed limitations . . . are unsupported and, therefore, the ALJ may properly discount the treating source opinions." (citing collected cases)); *Nolcox v. Berryhill*, No. 1:17-cv-02655, 2019 U.S. Dist. LEXIS 49412, at *24 n.5 (N.D. Ohio Mar. 25, 2019) (collecting cases).  In this instance, lack of explanation for the statements in the OEDI and FED applications rendered the opinions therein patently deficient.  *See Hernandez*, 644 F. App'x 468, 474-75 (6th Cir. 2016); *Burgess v. Comm'r of Soc. Sec.*, No. 19-13243, 2021 U.S. Dist. LEXIS 58803, at *15 (E.D. Mich. Mar. 29, 2021); (Tr. 297); *see also Fleming v. Comm'r of Soc. Sec.*, No. 4:10-CV-25, 2011 U.S. Dist.

LEXIS 81040, at *28 (E.D. Tenn. July 5, 2011).  Thus, even if the ALJ had erred in analyzing

the application forms, such error was harmless given this independent ground for rejecting those

opinions.  *See Paradinovich v. Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-1888, 2021 U.S. Dist.

LEXIS 213589, at *24-25 (N.D. Ohio Sept. 28, 2021) (concluding similarly).

    Finally, Chitwood contends that the ALJ failed to properly consider the evidence

provided by Mr. Cesta, a service and support administrator for TCBDD.  ECF Doc. 10 at 27-28.

First, the emails in the record from Mr. Cesta – which appear to be emails to Chitwood's lawyer

during the administrative stage – described Chitwood's experience with job training and

placement, did not appear to state any specific mental or physical limitations, and simply detailed

that Chitwood had prior issues with completing work tasks and maintaining employment.

(Tr. 937-939).  Second, the emails constituted nonmedical opinions.  The ALJ discounted them

for that reason, stating "this is not a medical source, and there is no associated mental health

treatment to support any proposed limits."  (Tr. 29).  Ultimately, the ALJ applied proper legal

standards in evaluating the nonmedical opinion evidence from Mr. Cesta.  42 U.S.C.

§ 1383(c)(3); *Rogers*, 486 F.3d at 241.

    Moreover, the ALJ thoroughly summarized the statements in Mr. Cesta's emails and then

addressed both the consistency and supportability of the opinions.  (Tr. 29).  For consistency, the

ALJ pointed to statements that contradicted an inability to work full-time, specifically statements

from: (i) Chitwood's high school vocational program, which noted that he displayed "great work

ethic and an ability to work towards daily goals and quotas"; and (ii) a 2022 employer, indicating

that he did "pretty well" as long as he was not alone at work.  (Tr. 29 (citing Tr.  842, 949).  For

supportability, the ALJ noted that Mr. Cesta's assessments: (i) did not explain "how the claimant

was unable to work alone at the Air Base when he was able to perform another job being a Door

Dash driver, where he would not be expected to have a team to coach and support him"; and (ii) lacked any associated medical evidence or support.  (Tr. 29).

Regardless, the ALJ was not required to give the sort of reasons for discounting the opinions of Mr. Cesta that he would have been required to give if evaluating a medical source opinion.  *Compare* 20 C.F.R. § 416.927(c)(2) (treating medical opinions), *with* 20 C.F.R. § 416.927(f) (other source opinions).  Because the ALJ applied proper legal standards in evaluating Mr. Cesta's emails, and the ALJ's reasons for discounting them were reasonably drawn from the record, the decision to discount Mr. Cesta's opinions was within the Commissioner's "zone of choice" and cannot be second guessed.  *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783; *Mullen*, 800 F.2d at 545.

## IV.  Conclusion

Because the ALJ failed to apply proper legal standards by failing to adequately articulate why he rejected certain limitations opined by Dr. Matyi, the Commissioner's final decision denying Chitwood's applications for DIB and SSI is VACATED and Chitwood's case is REMANDED for further consideration.

**IT IS SO ORDERED.**

Dated: March 15, 2024

Thomas M. Parker
United States Magistrate Judge